UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KENAN ALLEN** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-8464** |
| **DARREL VANNOY** | **SECTION: "S"(3)** |

## REPORT AND RECOMMENDATION

Petitioner, Kenan Allen, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On December 5, 2012, petitioner was convicted of one count of second degree murder and three counts of attempted second degree murder under Louisiana law.[1] On January 8, 2013, he was sentenced as follows: on the count of second degree murder, life imprisonment without benefit of probation, parole, or suspension of sentence; and on each count of attempted second degree murder, fifty years imprisonment. It was ordered that the sentences be served concurrently.[2] On May 21, 2014, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[3] The Louisiana Supreme Court then denied his related writ application on February 6, 2015.[4]

---

[1] State Rec., Vol. 4 of 6, transcript of December 5, 2012, pp. 167-68; State Rec., Vol. 1 of 6, minute entry dated December 5, 2012; State Rec., Vol. 3 of 6, jury verdict forms.
[2] State Rec., Vol. 4 of 6, transcript of January 8, 2013; State Rec., Vol. 1 of 6, minute entry dated January 8, 2013.
[3] State v. Allen, 141 So. 3d 877 (La. App. 4th Cir. 2014); State Rec., Vol. 4 of 6.
[4] State v. Allen, 158 So. 3d 814 (La. 2015); State Rec., Vol. 6 of 6.

On January 4, 2016, petitioner filed an application for post-conviction relief with the state district court.[5] That application was denied on January 14, 2016.[6] On April 7, 2016, the Louisiana Fourth Circuit Court of Appeal then denied his writ application challenging the denial of post-conviction relief but transferred a related motion to recuse the trial judge to the state district court.[7] The district court denied that motion to recuse on April 14, 2016.[8]

Unaware of the district court's order denying the motion to recuse, petitioner filed a new writ application with the Court of Appeal seeking assistance in obtaining a ruling on the motion.[9] On November 14, 2016, the Court of Appeal denied that writ application as moot, informing petitioner that the district court had denied the motion.[10]

On January 17, 2017, petitioner then sought review by the Louisiana Supreme Court.[11] On August 3, 2018, the Louisiana Supreme Court refused to consider petitioner's writ application because it was not timely filed.[12] The Louisiana Supreme Court then likewise denied his motion for reconsideration on November 20, 2018.[13]

In the interim, on August 28, 2018, petitioner had filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[14] At his request, these proceedings

---

[5] State Rec., Vol. 1 of 6. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to the *pro se* filings in this case, this Court will simply use the signature date of the applications as the filing date, in that the applications were obviously placed in the mail no earlier than the date they were signed.
[6] State Rec., Vol. 1 of 6, Order dated January 14, 2016.
[7] State v. Allen, No. 2016-K-0210 (La. App. 4th Cir. Apr. 7, 2016); State Rec., Vol. 5 of 6.
[8] State Rec., Vol. 6 of 6, Order dated April 14, 2016.
[9] State Rec., Vol. 5 of 6, Writ Application, Case No. 2016-K-1148.
[10] State v. Allen, No. 2016-K-1148 (La. App. 4th Cir. Nov. 14, 2016); State Rec., Vol. 5 of 6.
[11] State Rec., Vol. 6 of 6, Application for Writ of Certiorari, Case No. 17-KH-350.
[12] State ex rel. Allen v. State, 248 So. 3d 321 (La. 2018); State Rec., Vol. 6 of 6.
[13] State ex rel. Allen v. State, 256 So. 3d 987 (La. 2018); State Rec., Vol. 6 of 6.
[14] Rec. Doc. 1. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner declared under

were then stayed pending the resolution of the motion for reconsideration by the Louisiana Supreme Court.[15]  Once that court denied the motion, these proceedings were reopened.[16]  The state thereafter filed a response arguing that petitioner's application should be dismissed with prejudice as untimely,[17] and petitioner filed a reply.[18]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a statute of limitations for petitioners seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Specifically, the AEDPA provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

---

penalty of perjury that his application was placed in the prison mailing system on August 28, 2018. Rec. Doc. 1, pp. 5-6.
[15] Rec. Doc. 10.
[16] Rec. Doc. 12.
[17] Rec. Doc. 19.
[18] Rec. Doc. 20.

As the state correctly argues in its response, Subsection (A) applies in this case.[19] Further, the Court finds that petitioner's application is untimely under that subsection for the following reasons.

As noted, under Subsection (A), a petitioner must bring his § 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Here, the Louisiana Supreme Court denied petitioner's direct-review writ application on February 6, 2015.[20]  Accordingly, his state criminal judgment became final for AEDPA purposes, and his federal limitations period therefore commenced, on May 7, 2015, when his period expired

---

[19] In his federal application, petitioner refers to the district court's failure to serve him with a copy of its order denying his motion to recuse the trial judge as a state-created impediment.  See Rec. Doc. 1-1, pp. 4-5.  To the extent that he intends that reference as a suggestion that Subsection (B) applies in his case, the undersigned rejects that argument.  In its response to petitioner's application, the state argues that Subsection (B) does not apply because the state district court's failure to serve petitioner with a copy of the order in no way *prevented* him from seeking federal relief in a timely manner.  See Rec. Doc. 19, p. 5.  That is obviously correct in light of the fact that petitioner learned of the state district court's denial by virtue of the Court of Appeal's decision of November 14, 2016, *five months* before the expiration of his federal limitations period under Subsection (A).  See Clarke v. Rader, 721 F.3d 339, 343 (5th Cir. 2013) (holding that even if a court's failure to give notice of its decision could trigger Subsection (B), that purported "impediment" does not "prevent" a petitioner from seeking timely federal relief if he learns of the decision prior to expiration of the AEDPA's default limitations provision, i.e. Subsection (A)).  At best, the state district court's failure to timely serve petitioner with a copy of its decision is an issue to be considered as part of the Court's equitable tolling analysis.  See Rec. Doc. 19, pp. 7-8.

[20] State v. Allen, 158 So. 3d 814 (La. 2015); State Rec., Vol. 6 of 6.

for seeking further review by the United States Supreme Court. His AEDPA limitations period then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling. Regarding the statute of limitations, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

After two hundred forty-one (241) days elapsed, petitioner tolled his federal limitations period by filing a post-conviction application with the state district court on January 4, 2016. Tolling then continued uninterrupted for the duration of the post-conviction proceedings – *so long as he sought supervisory review in a timely manner*. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). That qualifying phrase is of critical importance in the instant case.

As noted, the state district court denied petitioner's post-conviction application on January 14, 2016.[21] He then sought review of that judgment by filing a writ application with the Louisiana Fourth Circuit Court of Appeal, and the state does not argue that the writ application was untimely filed.[22] On April 7, 2016, the Louisiana Fourth Circuit Court of Appeal then denied the writ application but transferred a related motion to recuse the trial judge to the state district court.[23]

---

[21] State Rec., Vol. 1 of 6, Order dated January 14, 2016.
[22] See Rec. Doc. 19, p. 5. The undersigned further notes that the Court of Appeal addressed that writ application on the merits without any indication that it was untimely. See Grillette, 372 F.3d at 775 ("[W]hen the denial of an application is based on untimeliness, Louisiana courts routinely and unmistakably indicate so in their opinions. Thus, had the Louisiana Court of Appeal decided to reach the merits of the application notwithstanding a determination that the application was untimely, it appears that the court would have indicated any such untimeliness in its opinion." (citations omitted)).
[23] State v. Allen, No. 2016-K-0210 (La. App. 4th Cir. Apr. 7, 2016); State Rec., Vol. 5 of 6.

Although the district court denied that motion to recuse on April 14, 2016,[24] petitioner did not receive a copy of the order. Unaware of the denial order, he then filed another writ application with the Court of Appeal seeking assistance in obtaining a ruling on the motion.[25] On November 14, 2016, the Court of Appeal denied that writ application as moot, informing petitioner that the district court had denied the motion.[26]

The crucial question, therefore, is whether petitioner then sought further review in a timely manner. For the following reasons, it is clear that he did not.

It is true that petitioner subsequently filed a writ application with the Louisiana Supreme Court.[27] However, that application was not timely filed under state law. As noted, the Louisiana Fourth Circuit Court of Appeal denied relief on November 14, 2016. Petitioner thereafter had only thirty days, i.e. until **December 14, 2016**, to seek review by the Louisiana Supreme Court. See Louisiana Supreme Court Rule X, § 5(a). Petitioner failed to comply with that deadline, waiting to file his Louisiana Supreme Court writ application until **January 17, 2017**.[28] As a result, the Louisiana Supreme Court refused to consider the application, expressly stating: "WRIT NOT CONSIDERED. Untimely filed pursuant to La. S. Ct. Rule X § 5."[29]

The United States Supreme Court has held that a state post-conviction filing it cannot be considered "properly filed" within the meaning of § 2244(d)(2) where, as here, the filing was rejected by the state courts as untimely. Pace v. DiGuglielmo, 544 U.S. 408, 410 (2005). Simply

---

[24] State Rec., Vol. 6 of 6, Order dated April 14, 2016.
[25] State Rec., Vol. 5 of 6, Writ Application, Case No. 2016-K-1148.
[26] State v. Allen, No. 2016-K-1148 (La. App. 4th Cir. Nov. 14, 2016); State Rec., Vol. 5 of 6.
[27] State Rec., Vol. 6 of 6, Application for Writ of Certiorari, Case No. 17-KH-350.
[28] The Writ Application Filing Sheet which accompanied the application was dated "1-17-17" by petitioner. Id. Moreover, in his reply to the state's response in this proceeding, petitioner concedes that he filed his Louisiana Supreme Court writ application "[o]n or about Jan. 17, 2017." Rec. Doc. 20, p. 2.
[29] State ex rel. Allen v. State, 248 So. 3d 321 (La. 2018); State Rec., Vol. 6 of 6.

6

put: when a post-conviction filing is untimely under state law, "that is the end of the matter for purposes of § 2244(d)(2)." Id. at 414 (quotation marks and brackets omitted). Moreover, it is abundantly clear that a federal habeas petitioner in fact receives *no tolling credit whatsoever* for an untimely Louisiana Supreme Court writ application. Williams v. Cain, 217 F.3d 303 (5th Cir. 2000); see also Cook v. Yelverton, Civ. Action No. 16-954, 2016 WL 3189699, at *4 (E.D. La. May 9, 2016) (Shushan, M.J.), adopted, 2016 WL 3167689 (E.D. La. June 7, 2016) (Barbier, J.); Batiste v. Rader, Civ. Action No. 11-1025, 2011 WL 8185554, at *2 (E.D. La. Dec. 7, 2011) (Chasez, M.J.), adopted, 2012 WL 2527063 (E.D. La. June 29, 2012) (Berrigan, J.); Marshall v. Warden, Avoyelles Correctional Center, Civ. Action No. 09-7231, 2010 WL 2977375, at *2 (E.D. La. June 11, 2010) (Knowles, M.J.), adopted, 2010 WL 2978218 (E.D. La. July 20, 2010) (Feldman, J.); Jenkins v. Cooper, Civ. Action No. 07-0216, 2009 WL 1870874, at *5 (E.D. La. June 26, 2009) (Lemmon, J., adopting recommendation of Roby, M.J.).

Accordingly, the undersigned finds that petitioner's post-conviction proceedings ceased to be "pending," and statutory tolling therefore ended, on **December 14, 2016**, i.e. thirty days after the Court of Appeal denied relief, when petitioner's deadline expired for seeking review by the Louisiana Supreme Court. See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004) (a state application ceases to be pending when the time for supervisory review expires).

When the limitations period then resumed running at that point, petitioner had one hundred twenty-four (124) days remaining. Accordingly, he had only until **April 17, 2017**, either to again toll the limitations period or to file his federal application.

7

Because petitioner receives no tolling credit for the untimely Louisiana Supreme Court writ application, and because he had no other properly filed applications for "State post-conviction or other collateral review" pending on or before April 17, 2017, he is not entitled to further *statutory* tolling.

The Court must next consider *equitable* tolling.  The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling.  Holland v. Florida, 560 U.S. 631, 645 (2010).  However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  Id. at 649 (internal quotation marks omitted); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").  A petitioner bears the burden of proof to establish entitlement to equitable tolling.  Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).

Here, petitioner argues that he is entitled to equitable tolling based on the fact that the state district court failed to mail him notice that his motion to recuse was denied on April 14, 2016.  Clearly, equitable tolling can be warranted where a petitioner's ability to seek timely review was thwarted by his failure to receive notice of a judgment.  See, e.g., Williams v. Thaler, 400 F. App'x 886, 892 (5th Cir. 2010) ("Our delayed notice cases demonstrate that the simple fact that a petitioner did not receive notice that the AEDPA limitations period had ceased to toll may be an extraordinary circumstance that warrants equitable tolling.") (citing Phillips v. Donnelly, 216 F.3d 508, 511 (5th Cir. 2000)).

However, in the instant case, neither the state in its response in this proceeding nor the undersigned has faulted petitioner for not seeking further review *within the thirty days immediately after the April 14 judgment.* Rather, both the state and the undersigned have taken the position that the limitations *remained tolled* from the date that judgment was issued (without notice to him), through the date on which he was finally informed of the motion's denial in the Louisiana Fourth Circuit Court's judgment of November 14, 2016,[30] with tolling then finally ending thirty days later on **December 14, 2016**, when his time expired for seeking further review by the Louisiana Supreme Court.[31]

Therefore, the only question before the Court is whether petitioner is entitled to equitable tolling *after* December 14, 2016. He is not. As of November 14, 2016, he was on notice that both the state district court and the Court of Appeal had denied him relief. He was then fully able to seek further review by filing a Louisiana Supreme Court writ application on or before December 14, 2016. He did not do so. Rather, by his own admission, he waited until "[o]n or about Jan. 17, 2017" to file his writ application with the Louisiana Supreme Court.[32]

Because petitioner's failure to seek timely review by the Louisiana Supreme Court resulted solely from his own lack of diligence in failing to comply with that court's filing deadline, his failure to do so does not warrant equitable tolling. See <u>In re</u> <u>Wilson</u>, 442 F.3d 872, 875 (5th Cir.

---

[30] <u>State v. Allen</u>, No. 2016-K-1148 (La. App. 4th Cir. Nov. 14, 2016); State Rec., Vol. 5 of 6.
[31] It its response, the state takes the following position:

> The only filing impediment alleged here is failure of the state trial court to send Allen a copy of its denial of his recusal claim on collateral review. As noted above, this would not have constituted an impediment at all; *nor would it have caused Allen to lose any time under the one-year filing period, which remained tolled until after he was advised of the trial court's ruling by the Fourth Circuit.*

Rec. Doc. 19, p. 7 (emphasis added).
[32] Rec. Doc. 20, p. 2.

2006) ("The doctrine of equitable tolling is applied restrictively and, as we have held repeatedly, is entertained only in cases presenting rare and exceptional circumstances where it is necessary to preserve a plaintiff's claims when strict application of the statute of limitations would be inequitable. A petitioner's failure to satisfy the statute of limitations must result from *external factors beyond his control; delays of the petitioner's own making do not qualify.* … Equity is not intended for those who sleep on their rights." (emphasis added; citations and quotation marks omitted)).

Petitioner likewise is not entitled to equitable tolling for the period of time his untimely writ application was pending before the Louisiana Supreme Court. On the contrary, where, as here, a petitioner has sought review by the Louisiana Supreme Court but has reason to know that his writ application is untimely and therefore might be denied on that basis, federal law already affords him a mechanism to protect his rights while he seeks such state review: he can file a protective federal habeas corpus petition and ask that the federal proceedings be stayed while he pursues his state-court remedies. Pace v. DiGuglielmo, 544 U.S. 408, 416-17 (2005). In fact, petitioner used that precise procedure while his motion for reconsideration was pending before the Louisiana Supreme Court.[33] His misjudgment in not using that same procedure at the time he filed his original writ application simply is not a basis for equitable tolling.

Lastly, the Court also notes that the United States Supreme Court has held: "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 569 U.S. 383, 386 (2013). Petitioner has not invoked McQuiggin.

---

[33] See Rec. Docs. 1-4 and 10.

However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that petitioner has not made the showing required under McQuiggin for the following reasons.

In McQuiggin, the Supreme Court expressly cautioned: "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 569 U.S. at 386 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). Further, as the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted). With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an "independent factual determination" to divine "what likely occurred." Id. (internal quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 F. App'x 605, 613 (6th Cir. 2013); accord Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *2-3 (E.D. La. July 27, 2015) (Morgan, J., adopting recommendation of Shushan, M.J.), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014) (Duval, J., adopting recommendation of Knowles, M.J.).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence presented at trial and on which petitioner's convictions were based. See, e.g., Johnson, 2015 WL 4528889, at *3; Lyles, 2014 WL 4674673, at *6. Here, the Louisiana Fourth Circuit Court of Appeal reviewed that evidence and found that the following facts were established at trial:

11

Alma Blevins died on April 27, 2010, as a result of burns she sustained in a fire which took place at her apartment on Third Street in New Orleans on January 19, 2010.  Her children, Meshia Davis and Kingmore Blevins, and her grandchild, Jamiri Davis, were also present when the fire took place at approximately 3 a.m., while they were asleep.  Defendant Kenan Allen, the boyfriend of Alma Blevins, was charged with intentionally starting the fire, which caused Alma Blevins' death.

Meshia Davis was nineteen-years-old at the time of trial.  She testified that she moved to New Orleans on January 1, 2010 from Jackson, Mississippi, and was living with her mother; her brother, Kingmore Blevins; her son, Jamiri Davis; and her mother's friend, "Dwayne[FN2]," on the date of the fire.

> [FN 2] The witnesses refer to Kenan Allen as "Dwayne."  The record indicates that the defendant's legal name is Kenan Allen, but that he used the aliases of Dwayne Maxey, Larry Moore, Kewan Allen, Ken Jones and Larry Allen.

Ms. Davis testified that on the evening of January 18, 2010, her mother and Dwayne got into several arguments, one concerning Dwayne talking on the phone to his ex-wife.  Alma Blevins and her children asked Dwayne to leave.  Ms. Davis testified that immediately after Dwayne left, a brick was thrown through the front window of the apartment.  Ms. Davis and her brother, Kingmore, stepped outside and saw Allen running down the street, but did not call the police.  Kingmore replaced the screen in the window.  Ms. Davis testified that Dwayne called her mother later that night and threatened to tell the New Orleans Police that Alma Blevins was in violation of her parole.  The police came to the apartment later that evening, asked Alma Blevins for her identification, and left.  Ms. Davis stated that everyone went to bed after the police left.  Ms. Davis slept in a room with her mother and her son, while her brother, Kingmore, slept in the front living room.

Ms. Davis testified that she was awakened by a "whoosh" sound, similar to when a barbeque pit is lit.  She looked up to see her mother on fire at the foot of her own bed and "Dwayne" standing in the bedroom doorway, who then fled the house.  She testified that her mother was completely covered in flames and that she saw Kenan Allen with a look on his face as that of "I want you to burn.  Burn."  She related that Allen fled the apartment as the flames spread quickly – seemingly originating from a trail of flames on the floor.  Ms. Davis removed her child from the burning apartment.  Ms. Davis testified that her mother managed to get out of the apartment, where Kingmore extinguished the fire in her hair.  A neighbor, "Ms. Sharon," placed a robe on her mother.  Ms. Davis suffered minor burns.

Kingmore Blevins, who was seventeen-years-old at the time of trial, testified that he and his mother, Alma Blevins, moved to the subject apartment in New Orleans, and that Dwayne moved in with them.  He testified that his mother and Dwayne argued on the evening of January 18, 2010, and that once they initially stopped arguing, Dwayne received a phone call, and another argument ensued between his mother and Dwayne.  Everyone told Dwayne to leave the apartment. Kingmore Blevins testified that after Dwayne left, a window in the front of the

apartment was broken from the outside by either a brick or piece of asphalt. Kingmore and his sister exited the apartment and saw Dwayne running down the street. A neighbor, "Ms. Sharon," called maintenance and was told the window could not be fixed until morning, so Kingmore Blevins placed the screen back in the window. He then went to sleep and was awakened by his mother rolling on his bed to "put herself out" as she was on fire. He stated that once they ran out of the apartment, he took his shirt off and used it to put the fire out in his mother's hair. He recalled "drips" of fire on the ground going out of the back door of the apartment like a "pattern." He testified that the next time he saw Dwayne was later that evening in a police car outside of the burning apartment complex.

Sharon Smith testified that she was a tenant of the apartment complex that caught fire the night of January 19, 2010, and that she lived next door to Alma Blevins. Ms. Smith identified Kenan Allen at trial and testified that she believed Allen had been living at Alma Blevins' apartment for about two months. She testified that on the night of the fire, she heard Alma Blevins and Kenan Allen arguing. Ms. Smith testified that she heard Alma Blevins' window shatter at approximately 9 p.m., and that she had bricks thrown through two windows in her apartment around 11 p.m. and again at 1 a.m. She called the police the first time, but told the officer that she did not know the name of the person who threw the brick. After the 1 a.m. incident, her nephew and his girlfriend apprehended Allen. She stated that Allen apologized for throwing the bricks through her window, and explained that he thought it was Alma Blevins' window. Allen offered to pay for the damages.

At approximately 3 a.m., Ms. Smith was awakened by Meisha Davis beating on her door and screaming about the fire. As Ms. Smith left her apartment, she saw Alma Blevins descending the stairs while still ablaze. She described Alma Blevins removing her burning nightgown, and said that she provided Alma with a robe.

Ashley Fain, a paramedic for the City of New Orleans, testified that on January 19, 2010, she responded to a two alarm fire on Third Street in New Orleans. Upon arriving at the scene, Alma Blevins was standing in front of the complex with burns over her entire body. Alma Blevins told her that she woke up on fire. Ms. Fain testified that Ms. Blevins' had burns to 70-80 percent of her body, and that after she transported Ms. Blevins to the trauma unit at University Hospital, she did not believe she would survive.

Harry Mendoza was a police captain with the NOPD, assigned to the New Orleans Fire Department in January of 2010. He testified that he was called out to the fire on Third Street in the early morning hours of January 19, 2010, and upon arrival saw damage to a second floor apartment that had traveled to the third floor. Captain Mendoza called Alcohol Fire and Tobacco unit ("ATF") agents, Dan Hebert and Chad Edmonds, to investigate the fire. Captain Mendoza testified that he interviewed Sharon Smith at the scene and was made aware of an incident between Ms. Blevins and Allen. From that interview, he determined that "Dwayne Maxie" was a suspect.

13

      The ATF agents were able to determine through use of the ATF's computer system that Dwayne Maxie's real name was Kenan Allen, and were able to obtain his photograph. Captain Mendoza also learned that Allen frequented the area of Oretha Castle Haley and Clio streets. He and ATF Agent Hebert went to that location, apprehended Allen, and transported him back to the scene. As they arrived, several people surrounded the police car and angrily shouted that Allen "was the guy" who started the fire. Sharon Smith positively identified Allen at the scene.
      Captain Mendoza testified that during the ride back to the scene, Allen attempted to establish an alibi by telling the officers that he was in a motel on Claiborne Avenue in New Orleans at the time the fire occurred; however, after determining this statement was false, Captain Mendoza charged Allen with aggravated arson.
      Daniel Hebert, a special agent with the ATF for twenty-four years, testified that he and Chad Edmonds, another ATF agent, investigated the fire on Third Street on January 19, 2010, to determine the possible origin of the fire and how it spread. Based on his observations, Agent Hebert determined that the fire was intentionally set with a liquid accelerant. Once Agent Hebert established the cause of the fire, he accompanied Captain Mendoza to look for the suspect.
      Agent Hebert testified that he and Captain Mendoza found Allen by use of the photograph they had obtained from a computer search and a description of his clothes they had obtained from witnesses on the scene. They arrested Allen, placed him in the back of Captain Mendoza's police car, and Agent Hebert read Allen his Miranda warnings. Agent Hebert stated that Allen attempted to give an alibi once they told him about the fire, but changed his story several times.
      Detective Christopher Harris testified that he was the lead detective in the homicide investigation. He testified that he was called to the coroner's office upon Alma Blevins' death on April 27, 2010. He received the reports from both ATF and the New Orleans Police Department concerning the events of January 19, 2010, and used the information gathered to classify the death as a homicide.
      Dr. Michael Defatta, a forensic pathologist, testified that he performed the autopsy on Alma Blevins, and determined that the deceased sustained deep thermo injuries to approximately ninety percent of her body. He identified photos of the burned body for the jury. He testified that although the primary cause of death was classified as sepsis, which caused pericarditis, the death was directly related to complications from the severe burns suffered by Ms. Blevins.[34]

The United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is required "to support his allegations of constitutional error with

---

[34] State v. Allen, 141 So. 3d 877, 879-81 (La. App. 4th Cir. 2014); State Rec., Vol. 4 of 6.

new reliable evidence -- *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* -- that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995) (emphasis added).

In the instant case, however, petitioner presents no new evidence whatsoever. Therefore, he cannot meet "the threshold requirement" for McQuiggin to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329). Accordingly, McQuiggin does not aid him.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence" exception applies, his federal application for habeas corpus relief had to be filed no later than **April 17, 2017**, in order to be timely. His application was not filed until **August 28, 2018**, and, therefore, it is untimely.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief filed by Kenan Allen be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

    New Orleans, Louisiana, this twenty-second day of March, 2019.

*signature*

**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**